**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-61997-CIV-HUCK/BANDSTRA**

MERLE WOOD & ASSOCIATES,
INC.,

      Plaintiff,

v.

TRINITY YACHTS, LLC,

      Defendant.

_____/

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on the parties' cross-motions for summary judgment. Defendant Trinity Yachts LLC ("Defendant" or "Trinity") seeks summary judgment in its favor with respect to each of Plaintiff Merle Wood and Associates, Inc.'s ("Plaintiff" or "MWA") claims set forth in MWA's Second Amended Complaint (*see* D.E. #42):  breach of oral contract, breach of implied contract, quantum meruit and unjust enrichment.  *See* D.E. #105 and 141. MWA seeks summary judgment in its favor with respect to six of Trinity's eleven affirmative defenses set forth in Trinity's Answer and Affirmative Defenses to Second Amended Complaint (*see* D.E. #43):  statute of limitations (second), statute of frauds (third), laches (fourth), estoppel (fifth), breach of contract (ninth) and setoff (eleventh).  *See* D.E. #146.  Trinity has withdrawn its first, sixth, seventh, and tenth affirmative defenses.  *See id.* at ¶5.  MWA is not moving for summary judgment on Trinity's eighth affirmative defense concerning accord and satisfaction. *Id.*  Each party has filed its respective response and reply, including one supplemental brief required by this Court (*see* D.E. #149), and the cross-motions are thus ripe for adjudication.  *See* D.E. #122, 130, 150, 153, 156 and 157.  The Court held oral argument on discrete issues in this matter on February 28, 2012.  For the reasons set forth below, the Court GRANTS Trinity summary judgment with respect to each of MWA's claims for breach of oral contract, breach of implied contract, quantum meruit and unjust enrichment and DENIES AS MOOT each of MWA's requests for summary judgment relating to Trinity's affirmative defenses.

## I.  Background[1]

MWA, a Florida corporation engaged in the listing and sale of yachts, initially filed this action against Trinity, a Louisiana limited liability company engaged in the business of yacht manufacturing and sales, on September 8, 2010 in Florida State Court.  *See* D.E. #1. Trinity removed the action to this Court on October 18, 2010 (*see id.*) and MWA subsequently filed an amended complaint on December 6, 2010 (*see* D.E. #11).  After this Court granted in part and denied in part Trinity's Motion to Dismiss the amended complaint without prejudice (*see Merle Wood & Assocs. v. Trinity Yachts, LLC*, 2011 U.S. Dist. LEXIS 22281 (S.D. Fla. Mar. 7, 2011)), MWA subsequently filed its Second Amended Complaint.  MWA alleges several alternative causes of action: breach of oral contract (Counts I and V), breach of implied contract (Count II), quantum meruit (Counts III and VI), and unjust enrichment (Counts IV and VII).

MWA is seeking to recover from Trinity brokerage commissions MWA is allegedly owed in connection with Trinity's sale of two yachts to Douglas Von Allmen.[2]  While it is undisputed that Trinity paid MWA $150,000 in connection with the 158-foot yacht (*see* D.E. #123 ¶32 and D.E. #132 ¶25), MWA alleges that this payment only represents a portion of the commission owed on the 158-foot yacht.  *See* D.E. #42, Compl. ¶¶21-22.  MWA also alleges that a full commission is owed for the subsequent sale of the 186-foot yacht.  *Id.* at ¶52.  MWA alleges breach of contract claims and alternatively quantum meruit and unjust enrichment claims with respect to both yachts premised on alternative reasons.  MWA claims it is entitled to a 5% commission because it introduced Von Allmen to Trinity for business purposes, rather than social purposes, and that Trinity contracted to pay MWA such commission, which included the $150,000 noted above, if Von Allmen actually purchased Trinity yachts.  Alternatively, if no contract is found, MWA claims that the sales resulting from the business introduction of Von

---

[1] Facts disputed by the parties are indicated as such throughout this section.  The Court notes that in reviewing the cross-motions for summary judgment it views the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party.

[2] These two yachts are referred to in this order as the "158-foot yacht" and the "186-foot yacht." Although the 158-foot yacht is alternatively referred to in the motion papers and in the evidence by different measurements such as 156 feet and 157 feet and the 186-foot yacht is alternatively referred to as 183 feet and 187 feet, all such alternative measurements for each will be expressed throughout this order using the 158- and 186-foot figures respectively.  Counts I-IV relate to the 158-foot yacht, while Count V – VII relate to the 186-foot yacht.

Allmen to Trinity would entitle MWA to recover the reasonable value of such benefit, which MWA alleges is the industry standard commission of five percent (5%).

The first pertinent legal dispute regarding MWA's introduction of Von Allmen to Trinity turns on whether an introduction for business purposes can be distinguished from an introduction for social purposes.  Neither party disputes that Von Allmen was acquainted with Trinity's principals, Felix Sabates and John Dane, before MWA's alleged introduction through its principal Merle Wood.  *See* D.E. #122.  According to the Affidavit of Von Allmen, he first met Felix Sabates, one of the principal owners of Trinity, in 1997 at the Boys and Girls Club Rendezvous at the Cat Cay Club in the Bahamas.  *See* D.E. #105-3 ¶2. Prior to meeting Wood, Von Allmen claims that Sabates walked him through a Trinity yacht, the Bellini, owned by John Porter.  *Id.* at ¶3.  John Dane, the President and CEO of Trinity, also testified that he and Von Allmen had been on the Bellini in 1999 and that Von Allmen again saw the Bellini in June of 2000.  Subsequently, Wood showed the Bellini to Von Allmen as his yacht broker.  *See* Deposition of John Dane, p. 20 ln. 23 - p. 22 ln. 20, D.E. # 105-12.  Von Allmen testified that his subsequent purchase of the Bellini from Porter in June 2001 with Wood's assistance was the first and only time that he used Wood's services.  *See* D.E. #105-3, Affidavit of Von Allmen, ¶4. With respect to Von Allmen's later purchase of the 158-foot yacht, Von Allmen testified that

> Mr. Wood was not involved in my purchase of the new '157 Trinity Yacht referenced in Mr. Wood's complaint.  I dealt solely with Mr. Sabates and another Trinity agent, Mr. John Dane, in the purchase of the 157' Trinity, with no suggestions, presentation, introduction, or coaching from Mr. Wood or any of his associates.  *Id.*

With respect to the 186-foot yacht, Von Allmen testified that

> I am in the process of building a 187' yacht with Trinity.  This construction and purchase was done without any input, solicitation, suggestion or encouragement from Merle Wood. *Id.* at ¶6.

While Wood does not claim to have initially introduced Von Allmen to Trinity for social purposes, Wood maintains that he introduced them for business purposes "as a buyer of new yachts."  *See* D.E. #122 p. 2.  Wood testified in a deposition that

> I introduced the Von Allmens to the Trinity product and the Trinity opportunity that resulted in them actually going and buying one [the pre-owned Bellini] and building two [the 158-foot and 186-foot yachts].  Felix [Sabates] met the Von Allmens, I don't know

3

what he did to try to sell them . . . . But it didn't work because the man that I met on that dock [Von Allmen] said I have no interest in buying a Trinity and I have no interest in building a Trinity . . . And I turned that around.  So I introduced to Trinity a Doug Von Allmen who was now a buyer of Trinities. . . I introduced him as a buyer of a preowned [the Bellini] and a new [the 158-foot yacht].  Which is why they agreed to pay me. Deposition of Merle Wood, pg/ln 214/13-215/15, D.E. #124-1.

MWA's alleged introduction of Von Allmen "to the Trinity product" appears to have occurred in 2001 in connection with Porter's sale of the Bellini to Von Allmen.  Although MWA alleges in its Second Amended Complaint that its introduction to Trinity occurred "[i]n or about 2004" (*see id.* at ¶35), MWA appears to adopt "2001" as the undisputed date of the introduction.[3]  *See* D.E. #122 p. 1.

The second pertinent legal dispute regards whether, upon Von Allmen actually purchasing a Trinity yacht, Trinity agreed to pay MWA a 5% commission, which included the the $150,000 noted above.  This dispute turns on whether a definite fee or percentage-based commission had been agreed between MWA and Trinity.   MWA alleges that "Trinity has refused and continues to refuse to pay MWA the commission as agreed upon" and suggests that the agreement was 5% by alleging "MWA is entitled to be paid the industry standard commission of five percent (5%)" (*see* D.E. #42, Compl. ¶¶22, 52).  MWA claims that "Defendant overlooks Mr. Wood's clear, unequivocal testimony that a fee of 5% had been agreed between him and Mr. Sabates as that is the industry standard fee payable to a broker for assisting a shipyard sell a new build yacht, unless a broker voluntarily agrees with the shipyard to a reduction."  D.E. #122 p. 3 citing Deposition of Merle Wood, pg/ln 281/2-281/11, D.E.

---

[3] MWA quotes Trinity as saying "Mr. Wood's own testimony shows that Mr. Von Allmen was well acquainted with both Mr. Sabates and Trinity prior to 2001, the date of the introduction alleged in the complaint."  D.E. #122 p. 1.  While Trinity was incorrect to cite 2001 as the date of the introduction "alleged in the complaint," it appears that MWA agrees with this date.  MWA did not correct this statement and appears to otherwise adopt it by including testimony of Merle Wood suggesting that 2001 was the date of introduction.  *See* Deposition of Merle Wood, pg/ln 19/24- 20/2.  D.E. #124-1 ("it was a collaborative effort [with Trinity] all the way from the beginning, and that would have started in two thousand one").  It is notable that if the introduction occurred in or about 2004, as the complaint actually alleges, this would undermine MWA's allegation that its introduction led to Von Allmen's purchase (*see* D.E. #42, Compl. ¶35) since it is undisputed that Von Allmen purchased the 158-foot yacht in November 2003. *See* D.E. #105-4.

#124-1 ("I had an agreement with Felix Sabates that I was going to be paid a 5 percent commission should they sign a contract to build a Trinity").

Trinity, on the other hand, claims that "no agreement to pay 5% was ever reached." D.E. #105 p. 2.  Trinity first cites a December 3, 2003 email from Peter Croke, an MWA employee, to Sabates, where Croke asked Sabates whether the 158-foot yacht deal was "a 5% deal and if so how will this one be paid if you are getting paid on delivery." *Id.* at p. 3 citing D.E. #105-7. That same day Sabates replied "no" and stated that the 158-foot yacht deal would be "referral fee" as "MWA had nothing to do with" the sale. *Id.*  Next, Trinity cites a December 25, 2003 fax from Croke to Sabates referencing the same deal where Croke noted that "Merle understands that it is not a normal commission, but he is interested to know what percentage is included." *Id.* citing D.E. #105-8.  Wood testified that "[n]ormal would be 5.  And [they] were prepared to be open to discussing less." *See* D.E. #122 citing Deposition of Merle Wood pg/ln 259/3 – 260/18, D.E. #124-1.  )."  On March 22, 2004, Wood wrote a letter to Sabates, saying, among other things:  "Imagine our surprise and disappointment when you dodged the issue and further to hear from John Dane that you had suggested less than 1% -- i.e., $150,000 for MW&A.  I can understand now why you didn't want to tell Peter how much." D.E. #124-4.

Trinity next cites Wood's testimony to show that no specific amount was agreed and that the negotiations were never concluded.  Wood was asked "[d]id you have an agreement on a specific amount that . . . Trinity was going to pay you?" *See* D.E. #130 p. 1 citing Deposition of Merle Wood p. 76 ln. 5 – p. 77 ln. 12, D.E. # 132-5.  Wood answered "no." *Id.*  Wood went on to explain "I never discussed with Felix [Sabates] up front what things were to going to be, because we would work through the deals. . . [it] always starts at five percent and then it works itself from there, depending on how the deal goes together . .. [w]e did not have a discussion about dollars and cents of . . . a commission." *Id.*  Later Wood was asked "[i]n fact you ultimately agreed to take less than five percent, didn't you?" *Id.* at p. 179 ln. 23 – p. 180 ln. 10. Wood answered, "No. We never had a conclusion." *Id.*  Wood also acknowledged in his testimony that he was willing to make a concession off of the five percent commission rate during negotiations:  "We knew that there was going to be some concession . . . [o]n the basis that I was looking forward to having a future relationship with Trinity . . . I was going to bend off of the five." *Id.* at p. 183 ln. 1-17.  Wood indicated that he planned to tie this negotiation to a separate dispute that the parties had over another yacht deal known as the Vargas matter. *See*

Deposition of Merle Wood pg/ln 259/3 – 260/18, D.E. #124-1 ("we were going to tie the Vargas matter into the fact that we were taking less").  MWA acknowledges that "Plaintiff does not dispute that the parties were negotiating the amount of the commission, but the Plaintiff was only doing so in an effort to resolve issues with Felix Sabates on the Victor Vargas matter." Plaintiff's Statement of Disputed and Undisputed Material Facts in Opposition to Defendant's Motion for Summary Judgment, D.E. #123 ¶18.

In any event, the parties agreed that Trinity would pay MWA $150,000 with respect to the 158-foot yacht sale.  Approximately one year after MWA began inquiring about its fee, on December 15, 2004, Croke emailed Dane that MWA was, "in regard to a payment on" the 158-foot yacht, "OK with getting a wire for $150,000."  D.E. 105-13.  Dane responded that he would wire "the $150,000 brokerage fee we agreed to pay for your services and assistance" on the 158-foot yacht.  *Id.*  Wood has testified, however, that such payment was intended to be only a partial payment:

> I did not agree to accept a hundred and fifty thousand as payment in full on Von Allmen. I only said, thanks, go ahead and send the hundred and fifty and we'll work the rest out down the road. That was my discussions [sic] with John Dane period."  Deposition of Merle Wood, p/ln 205/4-8, D.E. #148-4.

Last, it is also notable that Wood's and Dane's testimony reflect that Wood had never been paid a 5% commission by Trinity in any of the parties' past transactions.  *See* Deposition of Merle Wood, p. 117 ln 16 – p. 127 ln. 25, D.E. #132-5; Deposition of John Dane, p. 78 ln. 21 – p. 80 ln. 8, D.E. #132-11.

## II. Analysis

### A.  Standard of Review

Summary judgment is proper only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is "to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986) (*quoting* Fed. R. Civ. P. 56 advisory committee's note). In *Celotex Corp. v. Catrett,* the Court held that summary judgment should be entered only against

6

a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of the case with respect to which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23(1986).

To prevail, the moving party must do one of two things: (1) show that the non-moving party has no evidence to support its case, or (2) present "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc); *Young v. City of Augusta. Ga.*, 59 F.3d 1160, 1170 (11th Cir. 1995). In making this determination, the court must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir.1998) (citations and quotations omitted).

If the moving party successfully discharges this initial burden, the burden shifts to the non-moving party to establish, by going beyond the pleadings, that there is a genuine dispute[4] as to facts material to the non-moving party's case. *Young*, 59 F.3d at 1170. The non-moving party must do more than rely solely on its pleadings, and simply show that there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586-87. A genuine dispute of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 249 (1986); *Ritch v. Robinson-Humphrey Co.*, 142 F.3d 1391, 1393 (11th Cir. 1998); *EEOC v. Amego*, 110 F.3d 135, 143(1st Cir. 1997); *Thornton v. E.I. Du Pont De Nemours and Co., Inc.*, 22 F.3d 284, 288 (11th Cir. 1994). A dispute is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute is "material" if it is a legal element of the claim under applicable substantive

---

[4] In 2010, Rule 56(a) was amended to replace the word "issue" with the word "dispute" since the latter word "better reflects the focus of a summary judgment determination." The advisory committee noted, however, that the change was non-substantive and that the "standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note.

law which might affect the outcome of the case. *Anderson*, 477 U.S. at 248; *Allen*, 121 F.3d at 646.

A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough to meet this burden. *Anderson*, 477 U.S. at 252. *See also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment). However, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989).

### B.  *Breach of Oral Contract (Counts I and V)*

Given that MWA asserts that Trinity breached an oral contract with MWA, the first issue is whether an express oral contract existed between MWA and Trinity.

The United States Court of Appeals for the Eleventh Circuit recently discussed the requirements of Florida law with respect to prevailing on a breach of contract claim. In *Vega v. T–MobileUSA, Inc.*, the Court stated:

> For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach. *See, e.g., Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla.Dist.Ct.App.2008). To prove the existence of a contract, a plaintiff must plead [and establish]: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla.2004) (citing *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So.2d 297, 302 (Fla.Dist.Ct.App.1999)).  *Vega v. T–MobileUSA, Inc.*, 564 F.3d 1256, 1272 (11th Cir.2009).

Furthermore, to prove a breach of an oral contract, a plaintiff must establish that the "parties mutually assented to 'a certain and definite proposition' and left no essential terms open." *Uphoff v. Wachovia Securities, LLC, 2009 WL 5031345 *3 (S.D. Fla. 2009)* quoting *W.R. Townsend Contracting*, 728 So.2d at 300; *Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit Co.*, 773 So.2d 96, 97 (Fla.Dist.Ct.App.2000) ("Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms").  Where an agreement is not reached on an essential term and the parties continue to negotiate, no contract exists.  *See de Vaux v. Westwood Baptist Church*, 953 So.2d 677, 681 (Fla.Dist.Ct.App.2007)("[A] meeting of

the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract, and where it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting of the minds").   A prime example of an essential term is price, or in this case, the amount of the brokerage commission for which MWA has brought suit. *See Uphoff*, *2009 WL 5031345 *3* (complaint failed to allege a definite amount where it was merely alleged that defendant promised a "meaningful retention bonus" without providing a specifically agreed upon amount nor a method for calculating a specific amount); *Drost v. Hill*, 639 So.2d 105, 106 (Fla.Dist.Ct.App.1994) (contract unenforceable where "the parties had not reached a meeting of the minds on a material term, namely, the price"); *Jacksonville Port Authority*, 624 So.2d 313 (Fla.Dist.Ct.App.1993) ("[f]ailure to sufficiently determine quality, quantity, or price may preclude the finding of an enforceable agreement"); *Louis Sherry Associates, Inc. v. Opatut*, 414 So.2d 1148 (Fla.Dist.Ct.App.1982) (amount a party is willing to pay for services is an essential term).   Moreover, "[c]ustom in a particular industry . . . cannot change the requirement of contract law that the parties mutually agree on the essential term of price." *Uphoff*, *2009 WL 5031345 *3; see also Winter Haven,* 773 So.2d at 96 ("custom cannot change the law of contract").

Here, Trinity argues it is entitled to summary judgment as to MWA's breach of oral contract claims with respect to both the 158- and 186-foot yachts because the undisputed evidence shows that the parties had not reached an agreement regarding an essential element of MWA's claim – the payment of a percentage-based commission.   MWA, on the other hand, argues, in essence, that the price term (i.e., 5%) is supplied by a standard in the industry:  "the standing, open offer that Trinity and all other yacht builders in the industry have is that if a broker helps secure the business of a buyer of a new build yacht, the industry standard commission is payable unless otherwise agreed."   D.E. #122 p. 7.   MWA claims that "[a]t the time Von Allmen signed to purchase a new build yacht from Trinity, all elements of a contract were in place:  the Defendant offered to the yacht brokerage community a commission of 5% for helping secure new business, unless another amount is agreed upon; the Plaintiff accepted that offer by assisting in securing Von Allmen's business; and, the fee for doing so is 5%, unless a different arrangement is agreed." *Id.* at p.8.   According to MWA, "[a]fter the fact negotiations between Plaintiff and the Defendant, in an effort to resolve the other Vargas business and to foster a positive, ongoing business relationship, do not affect the validity of the parties'

9

agreement." *Id.*  MWA claimed that "all elements of a binding contract were in place, the contract was fully performed, and there is a concrete industry standard which is the objective manner in which brokers' commissions are determined in the absence of an agreement to the contrary." *Id.*

The Court disagrees with MWA's assertions.  First, as MWA acknowledges, the parties were continuing their negotiations and never specifically agreed on a 5% commission.  There is also no evidence that the parties agreed that 5% would be the default commission upon a failure to agree.   Moreover, MWA provides no support for the proposition that the price term can be supplied by a standard in the industry without mutual assent.  Thus, there was no meeting of the minds regarding the import of the industry standard commission.  *See McIver*, 875 So.2d at 381; *de Vaux*, 953 So.2d at 681.  The case law rejects the notion that such industry standards can be substitutes for the elements of contractual formation in the absence of mutual assent.  *See Uphoff*, *2009 WL 5031345 *3* ("[c]ustom in a particular industry . . . cannot change the requirement of contract law that the parties mutually agree on the essential term of price")*; Winter Haven,* 773 So.2d at 96 ("custom cannot change the law of contract"); *cf. Bornstein v. Somerson*, 341 So.2d 1043 (Fla. 2nd DCA 1977) (an industry standard may be a substitute for an open price term in a contract where so intended by the parties).  The facts show that Trinity expressly rejected this industry standard (*see* D.E. #105-7, email from Felix Sabates rejecting MWA's request that the 158-foot yacht deal be 5%) and that MWA acknowledged it intended to forego this standard (*see e.g.*, D.E. #132-5, Deposition of Merle Wood suggesting willingness to "bend off of the five").  In addition, MWA's own argument that "the industry standard commission is payable unless otherwise agreed" is an admission that the industry standard commission represents only the starting point for negotiations rather than the completion of negotiations that would render a definite  price term. That the price term was still subject to agreement is evidence that no contract was formed even though the Plaintiff insists that its willingness to negotiate the 5% fee "does not mean that an agreement between the parties had not been reached."  D.E. #122 p. 8.   Woods' conclusory testimony that he had "an agreement with Felix Sabates that [he] was going to be paid a 5 percent commission should they sign a contract to build a Trinity" (D.E. #122 p. 3 citing Deposition of Merle Wood, pg/ln 281/2-281/11, D.E. #124-1) is not supported by Wood's other testimony nor the other undisputed facts

of this case.  In fact, as indicated above, it is specifically shown to be contrary to the parties'
discussions and past dealings.

While the Court accepts that a contract for an open price term will not fail for
indefiniteness if the parties provide an objective method of determining price, *see Bee Line Air
Transport, Inc. v. Dodd*, 496 So.2d 874, 875 (Fla. 4th DCA 1986), an industry standard
representing the starting point of negotiations does not provide such an objective method for
determining the percentage of the commission in the instant case.  The only case cited by MWA
in support of this position is *Bee Line*, which is merely a *per curium* affirmance with no
discussion of the facts of the underlying dispute.   Of the cases cited within *Bee Line*, two of the
cases contained agreed to mathematical formulas for determining price while the third relied on
industry standards for the price of fruit where there was mutual assent for such substitute.  *See
Blackhawk Heating & Plumbing Co. v. Data Lease*, 302 So.2d 404 (Fla. 1974) ("The purchase
price was to be computed upon a rather complex mathematical formula set forth in the
agreement"); *Roe v. Winter Haven Co.*, 104 Fla. 317 (Fla. 1932) ("sales price [for boxes of fruit
was] fixed to be computed later in a particular way, that is, at the rate of $2.25 per field box"); *cf.
Bornstein*, 341 So.2d 1043 ("[i]t is obvious from the record that both Parker Brothers and B. C.
Cook & Sons intended to be bound and that the price of the fruit . . . [was] to be set according to
prevailing industry standards").  None of these cases involve facts similar to the instant case
where the parties were unsuccessful in reaching an agreement as to the percentage of the
commission for brokerage services and one party made a request for a specific percentage-based
commission that the other party immediately rejected.  Finding an oral contract for a 5%
commission in this context, moreover, would be particularly inappropriate where, as here, the
record reflects that over the duration of the parties' relationship, the commissions paid to MWA
never amounted to 5%.  The Court therefore rejects MWA's contention that the industry standard
commission provides an agreed upon objective method for determining price.

Accordingly, MWA has failed to establish an essential element of its breach of oral
contract claims – that the parties agreed to a specific percentage-based commission or an
objective method for determining such specific commission.  Thus, there is no genuine issue of
material fact that no express oral contract existed between MWA and Trinity since there is a
complete failure of proof concerning an essential element of the non-moving party's case – price.
*See Celotex Corp.,* 477 U.S. at 322-323.  For the foregoing reasons, the Court grants summary

judgment in favor of Defendants with respect to the breach of oral contract claims in Counts I and V.

### C.  *Breach of Implied Contract (Count II)*

Given that MWA next asserts, in the alternative, that Trinity breached an implied contract with MWA only with respect to the 158-foot yacht, the next issue is whether there was a contract implied in fact for that yacht.

As one Florida Court has noted:

> A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words. 17 Am. Jur. 2d "*Contracts*" § 3 (1964); 1 Arthur Linton Corbin, *Corbin on Contracts* §§1.18-1.20 (Joseph M. Perillo ed. 1993). Where an agreement is arrived at by words, oral or written, the contract is said to be "express." 17 Am. Jur. 2d "*Contracts*" at § 3. A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement. *Id.*; 3 *Corbin on Contracts* § 562 (1960). It is to this process of defining an enforceable agreement that Florida courts have referred when they have indicated that contracts implied in fact "rest upon the assent of the parties." *Policastro v. Myers*, 420 So. 2d 324, 326 (Fla. 4th DCA 1982); *Tipper v. Great Lakes Chemical Co.*, 281 So. 2d 10, 13 (Fla. 1973). The supreme court described the mechanics of this process in *Bromer v. Florida Power & Light Co.*, 45 So. 2d 658, 660 (Fla. 1950): "a court should determine and give to the alleged implied contract "the effect which the parties, as fair and reasonable men, presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had contracted expressly thereto." 12 Am. Jur. 766. *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So.2d 383, 385-386 (Fla. 4th DCA1997).

The Florida Supreme Court also indicated that:

> [A] greater burden should be placed upon a plaintiff who relies upon an implied contract than one who uses reasonable care and foresight in protecting himself by means of an express contract.  To hold otherwise would be to encourage loose dealings and place a premium upon carelessness. *Bromer,* 45 So.2d at 660.

Here, the parties discussed a percentage fee on the 158-foot yacht, but never reached an agreement with respect to a particular percentage.  The parties' express communications on the subject of a percentage, including the written communications by MWA's agent Croke, reflect explicitly that no agreement to pay a 5% fee was reached.  Approximately one year after MWA began inquiring about its fee, on December 15, 2004, Croke emailed the following to Dane:

> Merle sent me a memo relative to his discussion with you in regard to **a payment** on the Von Allmen LADY LINDA construction at Trinity and asked me to contact you to say that our accounting department is OK with getting a wire for $150,000 in this calendar year (emphasis added).  D.E. 105-13.

Dane responded that same day by saying the following:

> We will wire to the below address the $150,000 brokerage fee we agreed to pay for your services and assistance on our 158 ft. hull T-034 for Doug and Linda Von Allmen.  *Id.*

MWA claims that Croke's characterization of the $150,000 as "a payment," rather than "the payment" or the "entire" fee is evidence that the $150,000 was only meant to represent a portion of the commission owed on the 158-foot yacht and not the full payment.  Dane's email, however, contains no indication that the $150,000 represents anything other than the full payment for MWA's "services and assistance."   Nowhere does Dane indicate that the payment is meant to represent only a portion of the fee.  MWA's only evidence that it sought to clarify this purported ambiguity appears to be Wood's testimony that he told Dane to "send the one hundred and fifty and we'll work out the rest down the road."  D.E. #148-4.  Wood's testimony includes no definitive statement that the $150,000 was intended as a partial payment nor what the full payment would be.  In its Statement of Undisputed Material Facts, moreover, MWA merely asserts that it "did not represent to the Defendant that the $150,000 payment for its services and assistance on Mr. Von Allmen's 157' new build Trinity was the full and final payment owed to the Plaintiff."  D.E. #123, ¶31.  MWA fails to provide affirmative evidence that it conveyed to Trinity MWA's understanding that such payment was only in part and what was to be the agreed on balance. In addition, MWA points to an email from Dane on a different deal where he described the broker's fee as the "entire" fee in order to draw a contrast with the email relating to the 158-foot yacht where the word "entire" was not used.  *Id.* at ¶33.  Such evidence establishes no pattern that emails using the word "entire" have one meaning whereas emails omitting such word have a different meaning.

Last, the undisputed evidence reflects the fact that the parties' past dealings never involved a commission of 5%.  Thus, there is no evidence of a pattern based on prior conduct from which to infer a tacit promise.  Moreover, the express communications by Trinity rejecting a 5% commission and acknowledging agreement to pay a $150,000 brokerage fee undermine any argument that an unspoken agreement should be implied.

13

MWA thus fails to provide sufficient evidence for a reasonable jury to find that the $150,000 was intended only to be a partial payment and that an implied contract to pay 5% on all payments relating to the yachts was formed. Croke's email referencing only "a" payment, as opposed to "the" payment, and Wood's vague testimony that they would "work out the rest," is not enough for MWA to meet its required burden. *Anderson*, 477 U.S. at 252. This is especially true in light of the Florida Supreme Court's view that a greater burden of proof is placed upon a plaintiff who relies upon an implied contract.  For the foregoing reasons, the Court grants summary judgment in favor of Trinity with respect to MWA's breach of implied contract claim in Count II.

### D.  *Quantum Meruit and Unjust Enrichment Claims (Counts III, IV,  VI and VII)*

The next two issues raised by Trinity apply equally to MWA's quantum meruit and unjust enrichment claims.  The first is whether MWA's services provided a benefit to Trinity. The second is whether MWA's quantum meruit and unjust enrichment claims are time-barred. Each will be discussed in turn.

#### 1.   Whether MWA Provided Trinity a Benefit

A contract implied in law or a quasi-contract, as opposed to a contract implied in fact, is not based upon a finding, by a process of implication from the facts, of an agreement between the parties.  *See Commerce P'ship 8098 Ltd. P'ship*, 695 So.2d at 386.  Rather, "[a] contract implied in law is a legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct."  *Id.*  "To describe the cause of action encompassed by a contract implied in law, Florida courts have synonymously used a number of different terms – 'quasi-contract,' 'unjust enrichment,' 'restitution,' 'constructive contract,' and 'quantum meruit.'"  *Id.*  Accordingly, the Court treats MWA's quantum meruit and unjust enrichment claims together under the cause of action encompassed by a contract implied in law.

The elements of a cause of action for a contract implied in law are that:  "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *Id.  See also Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC* 650 F. Supp. 2d 1213,

1229 (S.D. Fla. 2009) (reciting elements of a cause of action for unjust enrichment); *cf. Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1194 (11th Cir. 2009) (reciting elements of a cause of action for quantum meruit).  Many courts have allowed brokers to recover in quantum meruit when a principal accepts a broker's services but the contract proves unenforceable for lack of agreement on essential terms, such as the amount of the broker's commission.  *See, e.g.*, *Weichert Co. Realtors v. Ryan,* 608 A.2d 280 (N.J. 1992) (in absence of contract, broker who was the procuring cause of the sale was entitled to restitution to prevent unjust enrichment of buyers); s*ee also Marta v. Nepa*, 385 A.2d 727 (Del. 1978); *Brakensiek v. Shaffer*, 203 Kan. 817 (Kan. 1969); *Edens View Realty & Invest., Inc. v. Heritage Enterprises*, 87 Ill.App.3d 480 (Ill. App. 1980); *Bangle v. Holland Realty Inv.*, 80 Nev. 331 (Nev. 1964).

Here, Trinity argues it is entitled to summary judgment as to MWA's quantum meruit and unjust enrichment claims with respect to both the 158- and 186-foot yachts because the undisputed evidence fails to show that "Plaintiff's 'services' were a benefit to the Defendant." D.E. #105 p. 11.  Trinity's argument, in essence, is that because Trinity was not introduced to Von Allmen through Wood, Von Allmen's subsequent purchases of the 158- and 186-foot yachts cannot be linked to Wood's alleged introduction.

MWA, on the other hand, argues that the record shows evidence that MWA's services were a benefit to Trinity.  MWA points to the December 15, 2004 email correspondence between Croke and Dane whereby Dane explicitly acknowledged that a $150,000 brokerage fee was being paid as compensation for MWA's "services and assistance" with respect to the 158-foot yacht.  *See* D.E. #122, p. 10-11 citing D.E. #105-13. MWA argues, moreover, that such services apply equally to the 186-foot yacht since "there are no additional services required of a broker once he assists with directing a customer to a particular shipyard and the customer buys his first new build yacht with that shipyard."  D.E. #122, p. 14.[5]    MWA also refers to the Affidavit of Nicolas Edmiston for the proposition that the "'introduction' of a buyer to a shipyard by a broker means the selling of the shipyard to a specific buyer, regardless of whether that client is known to, or has some form of social relationship with, the shipyard or its principals.   Affidavit of Nicolas Edmiston ¶¶2-3, D.E. #124-6.  Edmiston testifies that "[w]hen such an introduction is

---

[5] MWA cites Wood's testimony for the proposition that "[a] broker . . . helps the buyer and the seller merge together. . . [a]nd then from there . . . [t]here's nothing for him – no further input for him to give, zero."  Deposition of Merle Wood pg/ln 242/15 – 243/13, D.E. #124-1.

made . . . a broker is entitled to a commission or fee on all business that the buyer does with the builder." *Id.*  While it is undisputed that Von Allmen was socially acquainted with Trinity's principals prior to Wood's alleged introduction, there is a dispute over whether Wood introduced Von Allmen to Trinity for business purposes "as a buyer of new yachts" or whether Von Allmen's prior relationship with Trinity's principals was a mix of business relations and social acquaintance.    This is a question of fact.

      The Court agrees with MWA that Trinity has failed to show that MWA's services were not a benefit to Trinity.  Dane's December 15, 2004 email alone, which acknowledges and describes payment for such services, at a minimum, raises a genuine issue of material fact with respect to the first element of a contract implied in law, which is that the plaintiff has conferred a benefit on the defendant.  There is evidence to support that Trinity received a benefit from MWA's services once Von Allmen contracted to buy and began paying for the 158-foot yacht. Dane's email also shows knowledge of this benefit and that Trinity accepted and retained such benefit.[6]  Such facts speak to the second and third elements of a contract implied in law.  The final element of a contract implied in law is that a defendant cannot retain a benefit without paying "fair value" for it. While Dane's email also provides evidence that Trinity paid for such benefit, the determination of whether the payment was fair is a question of fact. Both parties acknowledge that the $150,000 payment made by Trinity to MWA represented a fee of 4.2% of the $3,600,000 received from Mr. Von Allmen at the front end of the construction project.  *See*

---

[6] The Court notes that Trinity also argues that MWA's services were simply the unnecessary efforts of an interloper.  *See* D.E. #105, p. 11.  Such an argument invokes the second element of a quasi-contract claim:  the requirement that the defendant has knowledge of the benefit.  Trinity cites *Hermanowski on Behalf of Americable Associates v. Naranja Lakes Condominium No. Five, Inc.*, 421 So.2d 558 (Fla. 3rd DCA 1982), which is plainly distinguishable, for the proposition that Wood was acting officiously.  In such case, the Court found, in essence, that a cable provider was not entitled to restitution because it conferred unwanted benefits without the Defendant's knowledge. *Id.* at 560.  ("Americable [cannot] claim that the Association had actual or implied knowledge of the improvements since the bulk of the work in upgrading the system was done some distance away from the condominium complex. . . . Americable officiously conferred the benefits . . . without any meeting of the minds regarding rates or services").  In the instant case, Trinity fails to show that it did not have knowledge of MWA's services or that the benefits were unwanted.  On the contrary, the evidence is overwhelming that it had such knowledge and desired such benefits.  *See e.g.,* Deposition of Merle Wood, pg/ln 19/1-19/25, D.E. #124-1.

D.E. #122, p. 18; D.E. #156, p. 2.  There is evidence that such fee is less than the purported industry standard commission of 5% that MWA alleges is the reasonable value of the services provided to Trinity by MWA.

While the questions of whether MWA introduced Von Allmen to Trinity for business purposes and whether MWA was paid "fair value" for its services would be for the fact finder to decide, this Courts' finding, as discussed in the next subsection, that MWA's unjust enrichment and quantum meruit claims are time-barred renders these questions of fact moot.

### 2. Whether the Statute of Limitations Has Passed On MWA's Quantum Meruit and Unjust Enrichment Claims

The statute of limitations applicable to MWA's quantum meruit and unjust enrichment claims provides a four year window to file a complaint for "[a] legal or equitable action on a contract, obligation, or liability not founded on a written instrument."  Fla. Stat. § 95.11(3)(k); *see also Swafford v. Schweitzer*, 906 So.2d 1194, 1195 (Fla. 4th DCA 2005) (noting that the statute of limitations for unjust enrichment claims is four years under § 95.11(3)(k)). This suit was filed on September 8, 2010 making September 8, 2006 the critical date for statute of limitations purposes.  Under Florida law, the general rule is that "the time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." Fla. Stat. § 95.031.

In the instant case, MWA argues that an exception to the general rule known as the delayed discovery doctrine applies to delay the accrual of its claims.  "The 'delayed discovery' doctrine generally provides that a cause of action does not accrue until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action."  *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1280 (11th Cir. 2003) (citing *Hearndon v. Graham*, 767 So.2d 1179, 1184 (Fla. 2000)); *see also* Fla. Stat. § 95.031(2).  "The delayed discovery doctrine applies to the accrual of a cause of action; it does not toll the applicable statute of limitations once the cause of action has accrued and the statute of limitations has begun to run." *See Raie* 336 F.3d *at 1280 (citing Hearndon,* 767 So.2d *at 1284).*

The delayed discovery doctrine is germane to a specific question posed by this Court to the parties:

> Given Plaintiff's assertion that it did not have knowledge of any of the partial payments
> until "discovery in this litigation" (D.E. #122, p. 19 FN 7) and that Defendant represented

to Plaintiff that Defendant would "not get paid until the boat is delivered" (D.E. #105-7),
is there case law showing that Plaintiff must have actual or constructive knowledge of
Defendant's receipt of the partial payments before its cause of action accrues?  D.E.
#149.

To support its argument that the delayed discovery doctrine applies, MWA cites 11th Circuit
precedent from 1994 and two cases following such precedent for the proposition that "Florida
courts . . . have broadly adopted the discovery principle, holding in a variety of legal contexts
that the statute of limitations begins to run when a person is put on notice of his right to a cause
of action."  *Jones v. Childers*, 18 F.3d 899, 906 (11th Cir. 1994); *see also F.D.I.C. v. Stahl*, 89
F.3d 1510, 1521-22 (11th Cir. 1996); *Brandt v. Lazard Freres & Co., LLC*, Case No. 96-2653-
CIV-DAVIS, 1997 U.S. Dist. LEXIS 23705 at 7 (S.D. Fla. August 1, 1997).  None of the legal
contexts noted in *Jones*, however, included unjust enrichment or quantum meruit claims.  *See
Jones*, 18 F.3d at 906 FN 11 (referencing a negligence action, a breach of contract action relating
to sexual abuse, a products liability action, and a fraud action).  MWA also relies on two cases
from the 1980s for the proposition that "[u]ntil MWA knew, or should have reasonably
discovered, that Trinity received payments from Mr. Von Allmen and then failed to pay
commissions on those progress payments, the statute of limitations on MWA's claims did not
begin to run."  D.E.# 157 p. 3.  *See Florida Power & Light Co. v. Allis-Chalmers Corp.*, Case
No. 86-1571-CIV, 1989 U.S. Dist. LEXIS 16640 at 12 (S.D. Fla. March 20, 1989);
*Dovenmuehle, Inc. v. Lawyers Title Ins. Co.*, 478 So.2d 423, 424-25 (Fla. 4th DCA 1985).
Neither case concerns unjust enrichment or quantum meruit.

Significantly, MWA ignores a more recent Florida Supreme Court case from 2002
rejecting the application of the delayed discovery doctrine to unjust enrichment actions.  *See
Davis v. Monahan*, 832 So. 2d 708, 710 (Fla. 2002).  In this case, the Florida Supreme Court
explained that the delayed discovery rule only applies to a limited number of cases codified by
statute such as fraud, products liability, professional and medical malpractice, and intentional
torts based on abuse, each of which permits postponing accrual where there is delayed discovery.
*See id.* ("Aside from . . . the delayed accrual of a cause of action in cases of fraud, products
liability, professional and medical malpractice, and intentional torts based on abuse, there is no
other statutory basis for the delayed discovery rule").  While the Florida Supreme Court has
recognized one narrow exception concerning childhood sexual abuse, the 11th Circuit, in

deciding that the delayed discovery doctrine should not be extended to wrongful death cases, made clear that the Florida Supreme Court's exception was meant to be narrow and that further case law extensions of the delayed discovery doctrine would not be justified:

> *Monahan* limits *Hearndon* so it applies only to cases of childhood sexual abuse. *Monahan* reversed a district court decision that had interpreted *Hearndon* broadly. *See Monahan*, 832 So. 2d at 710 ("No other Florida Court has interpreted *Hearndon* as broadly."). *Monahan* thus makes it clear that *Hearndon's* expansion of the statutory delayed discovery doctrine is as narrow as can be. More importantly, *Monahan* explained that the *Hearndon* court reached its decision "only after considering the unique and sinister nature of childhood sexual abuse." *Id.* at 712; *see also Hearndon*, 767 So. 2d at 1186.  In addition, the *Hearndon* court noted that the Florida Legislature had statutorily extended the delayed discovery rule to cases of childhood abuse with a 1992 amendment to FLA. STAT. ch. 95.11(7), though that amendment did not apply to the plaintiff in *Hearndon*, 767 So. 2d at 1186. In short, *Hearndon* was an exceedingly narrow decision that does not justify similar extensions of the delayed discovery rule to instances beyond those for which the Florida Legislature provided by statute. *See Raie,* 336 F.3d *at 1281-1282.*

The statute codifying the delayed discovery doctrine does not cover unjust enrichment and quantum meruit claims and *Monahan* already rejected extending this doctrine to such claims. This Court does not have the authority to extend the delayed discovery doctrine to claims of unjust enrichment and quantum meruit.  Rather, this Court must apply the general rule that "the time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues."  Fla. Stat. § 95.031.  As the Florida Supreme Court stated, "[t]o hold otherwise would result in this Court rewriting the statute, and, in fact, obliterating the statute."  *Monahan*, 832 So. 2d at 711.

Since the delayed discovery exception does not apply, this Court must determine under the general rule when MWA's causes of action for quantum meruit and unjust enrichment accrued.  Under the general rule, "[a] cause of action accrues when the last element constituting the cause of action occurs."  Fla. Stat. § 95.031(1).  The question then, for statute of limitations purposes, is when did all elements of MWA's cause of action for quantum meruit and unjust enrichment occur with respect to the 158- and 186-foot yachts?  This is a particularly challenging issue because there seems to be no legal precedent providing a clear answer under the facts presented here.

At the outset, this Court observes that neither the parties nor this Court have identified any Florida case law directly addressing the first element, when a broker confers a benefit upon a

seller in the context of brokerage services.  One line of cases suggests that a benefit is conferred upon the performance or last day of performance of services by the plaintiff.  *See e.g., Matthews v. Matthews*, 222 So. 2d 282 (Fla. 2nd DCA 1969) (finding that plaintiff's cause of action for quantum meruit accrued when plaintiff's services to the corporation were rendered); *Moneyhun v. Vital Indus.,* 611 So.2d 1316 (Fla. 1st DCA 1993) (finding that the statute of limitations for plaintiff's quantum meruit action began running when plaintiff left the company for whom he had been performing consulting services).   In the instant case, as MWA contends, it completed the performance of its services in 2001 upon MWA introducing the Von Allmens to the Trinity product.  Drawing a bright line upon introduction, however, would appear to set accrual too early because the Von Allmens, after such introduction, could have simply decided not to purchase any yachts at all.  In such case, MWA's services would not have conferred any benefit upon the Defendant.

A more recent case, which does not explicitly distinguish itself from the *Matthews* line of cases, suggests that a benefit is only conferred when a defendant receives payment.  *Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A.,* 938 So. 2d 571 (Fla. 4th DCA 2006).  This case, however, involved only one payment, as opposed to a series of partial payments, of attorney's fees to the defendant pursuant to a judgment.  There, the plaintiff law firm had an agreement to split a contingent fee with the defendant law firm.  The Court found that the plaintiff's cause of action for unjust enrichment would not have accrued until the defendant was paid.  To the extent this payment is viewed as a final payment rather than merely a payment, drawing a bright line upon final payment would appear to set accrual too late in cases where earlier payments were made.

Under the facts here, this Court is persuaded that the earliest time that the broker conferred a benefit upon the seller is the time that the seller and the buyer executed a purchase agreement after being brought together by the broker.   This is because execution of a contract creates a binding legal relationship between the buyer and seller.  Even if no payments are made, once such a contract is signed, the buyer is legally obligated to proceed with all payments to consummate the purchase and if the buyer defaults, the seller has the legal right to pursue a claim against the buyer.  The Court is persuaded that the latest time that a broker confers a benefit upon a seller is when the first payment by the buyer to the seller is made.  At such time, there is no question that the seller has been tangibly enriched.  While MWA urges this Court to find that the

statute limitations should begin running separately upon each partial payment or only upon final payment, such a rule would be inappropriate in the context of a contract implied in law where the inquiry is focused on when a benefit is conferred.  Each of the cases cited by MWA for the proposition that each payment gives rise to a new cause of action are factually distinguishable since they involve contracts rather than quasi-contracts and involve the two parties to the subject contract, not a third party broker who brought the contracting parties together. *See Welt v. Amerisourcebergen Drug Corp.*, Case No. 08-80287-CIV-HURLEY/HOPKINS, 2009 U.S. Dist. LEXIS 75315 at 12-13 (S.D. Fla. August 25, 2009) (agreement between a retail pharmacy and a wholesale medicine distributor whereby the wholesale medicine distributor was required to pay rebates specified in the agreement to the retail pharmacy); *see Greene v. Bursey*, 733 So.2d 1111, 1114 (Fla. 4th DCA 1999) (promissory note with monthly installment payments); *see Central Home Trust Co. v. Lippincott*, 392 So.2d 931, 933 (Fla. 5th DCA 1980) (same); *see Leeward v. Cablevision of Marion County, LLC,* Case No. 5:05-CV-303-OC-10GRJ, 2006 U.S. Dist. LEXIS 74669 at 5 (M.D. Fla. October 13, 2006) (agreement by one party to pay 40% of gross revenues to a second party); *Hannet v. Bryan*, 640 So.2d 203 (Fla. 4th DCA 1994) (assignment agreement whereby "Hannett assigned to Bryan one-half of Hannett's interest in all future syndication fees to be paid by Long Lake to Hannett").  Since it is undisputed that the contracts between Von Allmen and Trinity for both the 158- and 186-foot yachts were signed and first payment was made, in each case, before September 8, 2006 (*see* D.E. #105-4, 105-9, 124-9 and 124-11), this Court finds that MWA conferred a benefit on Trinity with respect to both yachts before the critical date for the statute of limitations.

The Court also finds that the remaining two time critical elements of a contract implied-in-law had occurred prior to September 8, 2006.  With respect to the second element, Dane's December 15, 2004 email provides undisputed evidence that Trinity had knowledge of MWA's services and assistance with respect to the 158-foot yacht.  Such knowledge can also be imputed to the 186-foot yacht since MWA does not claim to have performed additional services in between the signing of the 158- and 186-foot yachts.  With respect to the third element, it is undisputed that Trinity has accepted and retained the benefits of both contracts and the payments required thereunder in each case.

Moreover, Trinity made it clear in Dane's December 15, 2004 email that it would be paying less than 5% on the 158-foot yacht.  Because MWA takes the position that 5%, rather

than 4.2%, is fair value, MWA was on notice on December 15, 2004 that Trinity would be retaining the benefit of MWA's services at that time without paying what MWA contends is fair value. MWA also contends, by analogy to contract, that all elements of a contract were in place even before December 15, 2004. See D.E. #122, p. 8 ("[a]t the time Von Allmen signed to purchase a new build yacht from Trinity, all elements of a contract were in place"). Trinity, moreover, made no payment to MWA on the 186-foot yacht. Since the record provides no evidence that Trinity indicates that the $150,000 payment was only meant to be a partial payment, any failure to provide fair value clearly occurred by, if not before, December 15, 2004. Such failure can likewise be imputed to the 186-foot yacht since any commission owed would be on account of the same services. MWA, nonetheless, waited nearly six years to file its complaint. Accordingly, MWA's quantum meruit and unjust enrichment claims are time-barred and the Court grants Trinity summary judgment with respect to Counts III, IV, VI and VII.

## III. Conclusion

For all of the foregoing reasons, the Court GRANTS Trinity summary judgment with respect to each of MWA's claims for breach of oral contract, breach of implied contract, quantum meruit and unjust enrichment. As a result, each of Defendant's affirmative defenses are rendered moot. Accordingly, the Court also DENIES AS MOOT each of MWA's requests for summary judgment relating to Trinity's affirmative defenses.

DONE in Chambers, Miami, Florida this 9th day of March, 2012.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record